BROWN, Judge.
This is a suit for damages arising out of a rear-end collision between a left-turning Dodge van and an 18-wheel tractor-trailer. Plaintiffs appeal, challenging the jury’s apportionment of fault and amount awarded for damages.
FACTS
On February 17, 1989 at 8:00 a.m., plaintiff, Donna A. Sherman (Sherman), was driving a 1979 Dodge van east on Highway 2 in Union Parish when she slowed to make a left turn into the Darbonne Village Grocery Store. Defendant, Grady M. Simms (Simms), was also traveling east on Highway 2 in an 18-wheel tractor-trailer. Before Sherman could turn into the Darbonne Village Grocery Store, Simms’ truck collided with the rear right side of her van.
On August 14, 1989, Sherman and her husband filed suit against Simms, his employer, K.D. Auger Trucking Company, Inc., and Laramie Insurance Company seeking damages for injuries arising from the collision. Subsequently, due to Laramie’s liquidation, Sherman amended her petition to add Louisiana Insurance Guaranty Association (LIGA) and Auger Timber Company, Inc. (dismissed in final judgment).
On September 30, 1991, this matter was tried before a jury. In answer to special interrogatories, the jury found the following:
(1) that the accident caused Sherman to suffer damages;
(2) that Sherman contributed to her own injuries;
(3) that Sherman should be assigned 25% of the fault and Grady Simms should be assigned 75% of the fault;
(4) that Sherman was entitled to: $10,-000.00 for pain and suffering (past), $10,000.00 for mental anguish/loss of enjoyment of life (past), $6,000.00 for medical expenses (past), $2,000.00 for lost earnings (past), and that her husband, G.W. Sherman, was entitled to $1,000.00 for loss of consortium.
On November 4, 1991, judgment was signed in favor of plaintiffs and against K.D. Auger Trucking Company, Inc., Grady Simms and LIGA. In accordance with the jury's verdict, the total award to plaintiffs was reduced by 25% and defendants were ordered to pay damages totaling $21,-750.00.
Plaintiff assigns three errors to the jury’s verdict:
1. The jury clearly erred in finding 25% fault on the part of Mrs. Sherman.
2. The jury was manifestly erroneous in rejecting plaintiffs’ proof that Mrs. Sherman suffered a stroke as a result of the automobile accident.
*923 3. The jury abused its discretion in only awarding $6,000.00 for medical expenses when plaintiffs and defendants stipulated that the expenses were $11,949.16.
For the following reasons, we affirm in part and reverse in part.
STANDARD OF APPELLATE REVIEW
Well settled is the legal precept that an appellate court may not set aside a finding of fact by a judge or jury in the absence of manifest error or unless it is clearly wrong. Gibson v. Bossier City General Hosp., 594 So.2d 1332 (La.App.2d Cir.1991), writ denied, 594 So.2d 1332 (La.1992).
In Mart v. Hill, 505 So.2d 1120 (La.1987), the Louisiana Supreme Court described the two part test to be used for appellate review of facts:
1. the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court [jury], and
2. the appellate court must further determine that the record establishes that the finding is not clearly wrong.
Mart, 505 So.2d at 1127; McLain v. Glenwood. Regional Medical Center, 602 So.2d 240, 242 (La.App.2d Cir.1992). In essence, this test requires a reviewing court to do more than simply review a record for some evidence which supports the trial jury’s finding; it must determine that the record as a whole establishes the fact finder was justified in its conclusion. Housley v. Cerise, 579 So.2d 973, 977 (La.1991).
We are cognizant of the jury’s unique and advantageous position to observe the events at trial and better assess the evidence. It is the jury’s province to resolve conflicting inferences from the evidence. Gibson, supra. Thus, if the jury’s findings are reasonable in light of the record reviewed in its entirety, we may not reverse, even though convinced that had we been sitting as trier of fact, we would have weighed the evidence differently. Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106, 1112 (La.1990); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
With the above principles in mind, we proceed to review the facts and circumstances in the instant case.
ALLOCATION OF FAULT
On appeal, Sherman complains that the jury erred in allocating the percentages of fault. Specifically, Sherman contends that the jury erred in finding her 25% at fault because she properly signaled her turn, was struck from the rear and did everything possible to avoid the accident. Defendants contend that Sherman did not engage her turn indicator, came to an abrupt stop at the entrance to the grocery store and moved into the path of Simms’ tractor-trailer. Therefore, according to defendants, the jury’s factual conclusion that Sherman was 25% at fault is not manifestly erroneous and should be upheld on appeal.
Every motorist while operating his vehicle has a duty to drive prudently. Roux v. Louisiana Power & Light Co., 597 So.2d 118, 121 (La.App. 5th Cir.1992). This duty requires the driver to maintain a lookout ahead for hazards and to observe any obstructions present and exercise care to avoid them. Moore v. Chrysler Corp., 596 So.2d 225, 237 (La.App.2d Cir.1992), writ denied, 599 So.2d 316, 317 (La.1992). When a following vehicle collides with a preceding vehicle, the following motorist is presumed to be negligent. Cockerham v. U.S. Fidelity & Guar. Co., 559 So.2d 527, 530 (La.App.2d Cir.1990). When this presumption is applied, it effectively shifts the burden of proof to the driver of the following vehicle to prove that he was not negligent. Cockerham, 559 So.2d at 530.
Sherman testified that on the morning of the accident she was on her way to Vo-Tech school and intended to stop at the Darbonne Village Grocery Store to get gasoline. Sherman stated that she activated the van’s left turn signal and was about to turn into the store’s driveway when she heard the squeal of brakes. Sherman observed in her rear-view mirror the 18-wheel tractor-trailer and in an attempt to avoid the accident, moved her vehicle onto the right shoulder of the road way. However, Sherman could not escape the truck’s path and was hit from behind by Simms.
*924 Simms testified that he saw Sherman slow down to make a left turn at the first entrance of the grocery store but did not see a left turn signal. Simms testified that Sherman took her foot off the brake and proceeded onward past the first entrance to the second entrance to the grocery store. Simms testified that when he realized he would be unable to avoid the accident, he pulled his tractor-trailer onto the right-shoulder in an attempt to go around the right side of Sherman but struck the rear right side of her van approximately 12 inches off the right shoulder of the roadway.
Trooper Henry Boyles testified that Simms was operating his truck on the wet roadway at 55 m.p.h. when he applied his brakes. Boyles stated that Simms was unable to stop and collided with the right rear side of Sherman’s van. Boyles also testified that immediately after the accident, Simms informed him, contrary to Simms’ in court testimony, that Simms observed Sherman’s brake lights and turn signal. These statements by Simms were included in the accident report written by the trooper at the scene.
An examination of the photographs filed in evidence depicts a two lane paved highway with wide shoulders. Although there is a slight curve at the sight of the accident, the view of an approaching vehicle is clear for a long distance.
Comparative negligence is used to determine the damage award that is available when each party is found to have some degree of fault. A trier’s findings as to percentages of fault are factual and, in the absence of clear or manifest error, must be upheld on appeal. Baugh v. Redmond, 565 So.2d 953, 959 (La.App.2d Cir.1990); Williams v. Allstate Ins. Co., 599 So.2d 478, 483 (La.App. 3d Cir.1992). In automobile collisions, the law of comparative negligence will be applied when both drivers are found to be negligent. Cockerham, 559 So.2d at 530.
After reviewing the record, it is clear that fault was wrongly apportioned. Upon hearing the squealing brakes of Simms’ tractor-trailer, Sherman attempted to escape its path by moving off onto the right shoulder of the roadway. Unknown to Sherman, Simms was also attempting to avoid the accident by moving onto the right shoulder and consequently a collision resulted. Considering Sherman was faced with an 18-wheel tractor-trailer bearing down on her, we find it reasonable that Sherman drove her van onto the right shoulder in an attempt to move out of the truck’s path. Faced with this sudden emergency, Sherman cannot be faulted, in hindsight, for taking the wrong evasive action.
The evidence clearly showed that Sherman had signaled her turn. The trooper’s testimony is decisive in resolving this issue. Simms’ trial testimony was contradicted by his statements to the trooper at the scene that he saw both Sherman’s brake lights and turn signal.
In addition, if Simms was correct in his claim that Sherman moved from the first to the second driveway, then this only increased the distance to avoid the accident. This was obviously a shopping area and the truck driver’s view was clear for some distance. Simms admitted at trial that he looked off to the left just prior to when Sherman’s vehicle came to a complete stop. Considering that Simms was aware of Sherman’s intent to turn, he clearly failed to maintain a proper lookout. Under these circumstances, Simms did not exculpate himself from his presumed negligence emanating from rear-ending Sherman’s vehicle. Therefore, Sherman should not have been assigned any fault.
Accordingly, fault should be apportioned 100% to Simms and 0% to Sherman.
CAUSATION AND DAMAGES
The jury awarded Sherman $10,-000.00 for past pain and suffering, $10,-000.00 for past mental anguish and loss of enjoyment of life, $6,000.00 for past medical expenses, $2,000.00 for lost earnings, and $1,000.00 to her husband, G.W. Sherman, for loss of consortium. On appeal, Sherman contends that these awards were inadequate and an abuse of discretion. Specifically, Sherman argues that she suffered a stroke as a direct result of the *925 accident. Defendants argue that the stroke was not caused by the accident.
In this case the jury was faced with conflicting expert medical testimony pertaining to whether Mrs. Sherman’s stroke was connected to the accident. The jury resolved this issue in defendants’ favor.
During the course of the trial, medical testimony pertaining to Sherman’s stroke was introduced. Dr. Wadlington, a general practitioner, first saw Sherman on February 18, 1989, in the emergency room of Union General Hospital. Dr. Wadlington testified that Sherman was complaining of neck and low back pain, and numbness in her left leg. Dr. Wadlington took x-rays of Sherman, which revealed a reversal of cervical curvature (lordotic curve) and possibly strain of the lumbo sacral spine. He opined that Sherman was suffering from musculo ligamous strain of the cervical spine and possibly strain of the lumbo sacral spine. On that day, Sherman’s blood pressure was normal. Dr. Wadlington prescribed muscle relaxants and pain medication.
Dr. Wadlington saw Sherman again on February 22, 1989. At that time, Sherman complained of neck pain. Sherman made no mention of numbness or weakness in her left arm or left leg, nor was her hand constricted or drawn. Dr. Wadlington next saw Sherman on March 1, 1989; at that time Sherman was complaining of neck pain but had no complaints of left-side weakness or numbness. Dr. Wadlington inquired as to whether the prescribed medication was relieving the pain. When he found the medication was not relieving Sherman’s pain, he referred her to Dr. Richard Ballard (orthopedics). Dr. Wad-lington testified that during his examination he never thought Sherman was suffering from a stroke.
Dr. Ballard examined Sherman on March 2, 1989, approximately two weeks after the accident. Dr. Ballard testified that at the time he examined Sherman, she was complaining of pain at the base of the neck and in the muscles between her shoulder girdle area. Although Sherman’s pain was virtually constant, any movement increased her pain. Dr. Ballard administered a complete neurological examination with normal results. He noted that Sherman’s reflexes and gait appeared normal. He also noted that Sherman made no complaints about numbness or tingling in her upper or lower extremities. Dr. Ballard prescribed anti-inflammatory medication and muscle relaxants. Dr. Ballard examined Sherman again on March 14, 1989. At that time, Sherman had developed what Dr. Ballard described as facial palsy. Dr. Ballard was not under the impression that Sherman had suffered a stroke.
Sherman went to Union General Hospital on March 10, 1989, and was treated by Dr. Thomas Brantly who suspected Bells Palsy. On March 13, 1989, Sherman went to see Dr. Allen Herbert, a general practitioner. Dr. Herbert testified that he had examined Sherman previously on March 11, 1988, for a bee sting. At that time, Sherman’s blood pressure was elevated, measuring 130 over 94. Dr. Herbert further stated that on March 13, 1989, Sherman’s blood pressure was elevated, measuring 150 over 90. Dr. Herbert testified that he found Sherman had a drooping facial weakness. Although Dr. Herbert found that Sherman had no trouble shutting her eyes or blinking, he did find that she was having problems sleeping and was experiencing pain at the base of her skull. Dr. Herbert testified that this could have been caused by either Bells Palsy or a stroke.
Dr. Herbert referred Sherman to Dr. Joe Smith for a nerve conduction study. The study results were normal. Upon examining Sherman one week later, on March 21, 1989, Dr. Herbert ruled out Bells Palsy as a cause of the left-sided weakness in her face. He also found Sherman’s blood pressure to be elevated, measuring 150 over 90. Dr. Herbert had no opinion as to whether the accident was the cause of these problems.
Dr. Simonton was the next physician to examine Sherman. Dr. Simonton, admitted as an expert in orthopedics, testified that he saw Sherman on March 22, 1989. Dr. Simonton examined Sherman and found that she was experiencing a tingling in her *926 left upper extremity and her fourth and fifth fingers on her left hand. Dr. Simon-ton was of the opinion that Sherman might have been suffering from an irritation of the nerve root in her neck.
On March 23, 1989, Dr. Simonton referred Sherman to Dr. Schwendimann. At this time, Sherman was hospitalized by Dr. Simonton at Schumpert Medical Center. Dr. Schwendimann noticed that Sherman had left facial weakness and numbness. Dr. Schwendimann administered a physical examination and conducted an MRI and CT scan. After administering the physical and examining the results from both the CT scan and MRI, Dr. Schwendimann believed that Sherman had suffered a stroke. Dr. Schwendimann was of the opinion that the automobile accident and stroke were not related.
Sherman was also treated by Dr. Juanita McBeth, a board certified neurologist, beginning on June 26, 1989. Dr. McBeth testified that Sherman had paralysis of her left arm and left hand, weakness in her left leg and left side facial weakness. After reviewing Sherman’s medical history, Dr. McBeth opined that Sherman was suffering from post-traumatic vascular headaches and that Sherman had suffered a stroke that was a delayed reaction from a lesion in her neck. Dr. McBeth believed that a blood clot had formed at the point of a tear in one of the carotid arteries in her neck. She opined that the tear and resulting clot had caused Sherman’s stroke. Dr. McBeth also believed that the neck pain and numbness of her left leg noted in the emergency room report on the day of the accident were symptoms of the stroke. Dr. McBeth was of the opinion that it was more probable than not that Sherman’s paralysis and stroke were a direct result of the automobile accident.
Dr. Tom Gulick, a neurologist, examined Sherman’s medical records. After examining the records, Gulick stated that although he could not completely exclude the possibility that the motor vehicle accident was a factor in causing the stroke, there was not adequate reason to point to it as the most likely cause of the stroke. Dr. Gulick was of the opinion that the most likely cause of Mrs. Sherman’s stoke was what is referred to as “small vessel disease.” Dr. Gulick stated that this disease was related to hypertension and smoking; Mrs. Sherman both smoked and suffered from hypertension.
Under the facts of this case, the jury’s assessment that the stroke was not causally related to the automobile collision was not clearly or manifestly wrong. Accordingly, we affirm the jury’s award.
MEDICAL EXPENSES
The jury awarded $6,000 in past medical expenses. Plaintiff appeals this award arguing that medical expenses totaling $11,-949.16 were stipulated and should have been awarded. Defendant argues that the only stipulation made between parties at the time of trial was to the authenticity of the medical bills for the purpose of introducing them into evidence. Defendant argues that the causal relationship between the medical bills claimed by plaintiff and the injuries sustained was never stipulated.
A review of the trial transcript reveals the following:
MR. KYLE: Your Honor, ..., it may speed things up a little bit if we introduce certain exhibits into the record. These have been stipulated to, I think, by opposing counsel. One would be — Plaintiff’s One would be Schumpert Medical Center records. Two would be Union General Hospital records. There would be Lincoln General Hospital records. Four would be records of Physical Therapy Clinic. Five would be the medical bills and a summary of the same. Six would be the insurance policy of Laramie Insurance Company. I ask that these be marked and offered and introduced into evidence.
THE COURT: Any objections?
MR. NELSON: No objection ...
In Wickliffe v. Cooper & Sperrier, 161 La. 417, 422, 108 So. 791, 792 (1926), the Louisiana Supreme Court held that stipulations between the litigants in a specific case that are not in derogation of the law are binding upon the trial court in the disposition of that case. From Wickliffe, *927 supra, onward, the general rule has been that a stipulation has the effect of a judicial admission which binds the parties and the court when not in derogation of law. R.J. D’Hemecourt Petroleum v, McNamara, 444 So.2d 600, 601 (La.1983); Mobley v. Harrel, 571 So.2d 662, 664 (La.App.2d Cir.1990). To the extent the agreement affects only the rights of the litigants, it must be applied as the law of the case. Mobley, 571 So.2d at 664. However, a plaintiff cannot recover stipulated medical expenses incurred for treatment of a condition not proved to have been caused by the defendant’s conduct. Adam v. Southern Tours, Inc., 431 So.2d 425, 428 (La.App. 4th Cir.1983), writ denied, 438 So.2d 572 (La.1983); Waldo v. Toye Brothers Yellow Cab Company, 210 So.2d 125, 129 (La.App. 4th Cir.1968).
In the present case, the litigants’ stipulation consists of medical bills and summary of the same. However, because we have ruled that the jury was not manifestly/clearly wrong in rejecting causation between the accident and the stroke they were also correct in denying those medical expenses connected to the stroke.
DECREE
For the reasons stated above, the judgment of the trial court is AFFIRMED IN PART; REVERSED IN PART; AND RENDERED in favor of plaintiff, Donna A. Sherman, in the sum of $28,000 and plaintiff, G.W. Sherman, in the sum of $1,000 and against Grady M. Simms, K.D. Auger Trucking Company, Inc. and Louisiana Insurance Guaranty Association together with legal interest from date of judicial demand and all costs of these proceedings.
SEXTON, J., concurs.